# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

  **v.**                                                        **Case No. 13-CR-123**

**ROBERT LEO, JR.,**

    **Defendant.**

## RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

On July 2, 2013 a grand jury sitting in the Eastern District of Wisconsin returned a single count indictment against defendant Robert Leo, Jr. ("Leo"). The indictment charges that Leo, on or about May 3, 2013, possessed a firearm as a previously convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He was arraigned on the charges and entered a plea of not guilty. A final pretrial conference before the Honorable Charles N. Clevert, Jr. is scheduled for November 20, 2013 and trial is scheduled for December 2, 2013.

Before the Court is the defendant's motion to suppress evidence obtained from a search of his backpack by Racine Police. (Docket # 12.) On September 16, 2013, the Court conducted an evidentiary hearing on the defendant's motion to suppress. The motion has been fully briefed and is ready for resolution. For the reasons that follow, I recommend that Leo's motion to suppress be denied.

## EVIDENTIARY HEARING TESTIMONY

Racine Police Department Officers Robert Ortiz and Michael Seeger, and citizen, Enrique Aranda, testified at the hearing.

1. *Officer Ortiz*

Officer Ortiz has been employed with the Racine Police Department for the past seven and one half years. (Transcript of Sept. 16, 2013 Evidentiary Hearing ("Tr.") 16, Docket # 26.) Officer Oritz is currently assigned to the Community Orientated Policing Unit and is assigned as a neighborhood officer for an area encompassing several miles in each direction from 12th Street and Villa Street in the City of Racine. (Tr. 16-17.) On May 3, 2013 Ortiz was driving in the area of 12th Street and Villa Street when he saw two individuals in the one thousand block of Grand Avenue, which was approximately three blocks away from 12th and Villa. (Tr. 19.) As Ortiz approached them, he slowed down because he believed they appeared suspicious because they both had on black hoodies and appeared younger, and at that time of day younger kids should have been in school. (*Id.*) Ortiz also recognized one of the individuals, Enrique Aranda, because Aranda is his wife's cousin and because he has had prior police contact with him. (Tr. 19-20.) The other individual was later identified as the defendant, Robert Leo. (Tr. 36.)

Ortiz testified that as he approached Aranda and Leo, they took off running into a yard. (Tr. 20.) Ortiz continued driving and as he approached a house located at 1020 Grand Avenue, he saw Aranda standing by a screen door, which was open. (*Id.*) Ortiz continued driving southbound on Grand Avenue and as he approached 11th Street and Grand Avenue, he decided he was going to come back around to get a further look at what the two individuals were doing. (*Id.*) Ortiz testified that in "a matter of seconds" after reaching 11th Street and Grand Avenue, he received a call from dispatch stating that there was a possible burglary in progress at the lower unit of a duplex located at 1020 Grand Avenue. (Tr. 21, 25.) Ortiz continued to go around the block and proceeded to park in the 1100 block of Grand Avenue facing north so he could see 1020 Grand Avenue. (Tr. 21.)

- 2 -

The dispatch reported two subjects were involved in the possible burglary and described the subjects as Hispanic and wearing black hoodies. (Tr. 21-22.) The dispatch further stated that a handgun, possibly a revolver, was involved. (Tr. 21.) Ortiz testified that he did not immediately confront the two subjects because he was outnumbered. (Tr. 22.) Ortiz told dispatch what he had seen and Officer Seeger, another officer from Ortiz's unit, responded stating that he would be coming into the area with other officers. (Tr. 23.) Ortiz received an update from dispatch that the subjects left the yard and that one of the suspects took off the black hoodie and might be wearing a red jacket or sweatshirt. (Tr. 28.) Ortiz witnessed the subjects leave the yard and proceed to walk south on Grand Avenue. (*Id.*) Ortiz observed that Aranda was wearing a black hoodie while Leo had on red and was wearing a backpack. (Tr. 29-30.) As Aranda and Leo approached the intersection of 11th Street and Grand Avenue, Ortiz saw them turn west and continue walking west. (Tr. 30.) Ortiz continued to follow Aranda and Leo in his vehicle and saw them enter the parking lot of the Head Start School. (*Id.*) Both Ortiz's wife and Aranda's mother worked at the school. (Tr. 34.)

After observing Aranda and Leo enter the parking lot of the school, Ortiz exited his vehicle and approached them. (Tr. 31.) Ortiz testified that he was concerned for the safety of the parents, teachers, and children at the school because of the possible presence of a gun. (*Id.*) Ortiz testified that when a firearm is present, there is always the possibility that it could be discharged. (Tr. 36.) Ortiz identified himself as law enforcement and told them to stop; however, Aranda and Leo kept walking. (Tr. 31.) Ortiz then took out his service weapon, put it by his side, and told them in a louder voice to stop. (*Id.*) At that point Aranda and Leo stopped. (*Id.*) Ortiz ordered Aranda to come over by him. (Tr. 36.) At this point, Leo was approximately 15 to 20 feet away. (*Id.*) Ortiz put away his firearm and placed Aranda in handcuffs for officer safety and for the safety of the school. (*Id.*) Ortiz further

- 3 -

Case 2:13-cr-00123-CNC   Filed 10/30/13   Page 3 of 12   Document 31

testified that he handcuffed Aranda because he had received an update from dispatch that the witness who made the initial call about the burglary had seen Ortiz stop Aranda and Leo and confirmed that they were the two people that he had seen attempt to break into 1020 Grand Avenue. (Tr. 37.) Ortiz asked Aranda what he was doing by 1020 Grand Avenue and patted him down for weapons. (Tr. 39.) Ortiz found $40 in Aranda's pocket, but no weapons. (Tr. 39-40.)

    *2.       Officer Seeger*

Officer Seeger has been employed by the Racine Police Department for the past five and one half years. (Tr. 59.) Seeger is also assigned to the Community Orientated Policing Unit. (*Id.*) Seeger testified that on May 3, 2013 he received a call over the radio that there was an attempted burglary in progress and a complaint of a gun at 1020 Grand Avenue. (Tr. 61.) The call from dispatch stated the suspects were two male Hispanics wearing black hoodies; that one suspect was in possession of a handgun, possibly a revolver; that the gun was in a backpack; and that the suspect in possession of the gun took off the black hoodie and was now wearing a red hoodie. (Tr. 62.) Seeger testified that he located two suspects that matched the description from dispatch walking on Grand Avenue towards 11th Street. (Tr. 63.) One subject was wearing a black hoodie while the other was wearing a red hoodie with a black backpack. (*Id.*) Seeger did not immediately approach the subjects because he was outnumbered and because of the report of a firearm. (*Id.*) Seeger learned that Ortiz was also on the scene. (*Id.*)

Seeger observed Ortiz enter one of the entrances to the Head Start School parking lot and approach the subjects. (Tr. 65.) To prevent flight, Seeger enter the parking lot from the west end. (Tr. 63.) Seeger saw Leo walk towards the front doors of the school. (Tr. 67.) Seeger exited his vehicle and began to run towards Leo to prevent him from entering the school with a possible weapon. (*Id.*)

After approaching Leo, Seeger detained him with handcuffs for officer safety and for the safety of the school. (Tr. 67, 69.) Seeger patted down Leo's exterior clothing for weapons, but did not find any. (Tr. 70.) While conducting the pat down, Seeger testified that Leo made "numerous statements of I don't have anything. I consent to a search." (Tr. 71.) Seeger testified that Leo repeated the same thing multiple times. (*Id.*) Seeger stated that he found this unusual because individuals who are in possession of illegal contraband typically do not repeatedly consent to a search. (*Id.*) Seeger stated that he was not looking to obtain Leo's consent to search at the time and that if Leo had not consented to the search he would have searched him anyway because of the report of the firearm. (Tr. 72.) Seeger stated Leo was acting evasive—as if he wanted the police contact to be over with so he could get inside the school. (Tr. 79.)

Seeger testified that Leo had access to the backpack and thus Seeger removed it from Leo's shoulders. (Tr. 73.) Seeger could not recall exactly how he removed the backpack from Leo's shoulders, he testified that he either held Leo's hands together and then slid the backpack off Leo's shoulders or placed Leo in handcuffs and undid the straps of the backpack to allow the straps to fall off Leo's shoulders. (Tr. 87.) Seeger then set the backpack down on the ground and searched it. (Tr. 73.) In the backpack, Seeger found a black hoodie, a small digital scale with a greenish leafy substance that Seeger believed to be marijuana, plastic baggies, a box with three live .22 caliber round bullets, and a chrome .22 revolver wrapped in a blue and white cloth. (Tr. 73-74.)

   3.   *Enrique Aranda*

Aranda testified that he and Leo were walking to his mother's workplace, the Head Start School, in order to obtain gas money from her. (Tr. 100.) On the way to the school, an altercation occurred with some individuals in a vehicle. (Tr. 100-01.) Aranda and Leo then ran to a house. (Tr. 101.) After the altercation, Aranda and Leo continued walking to the Head Start School. (*Id.*) Aranda

testified he saw Ortiz running towards him and Seeger running towards Leo. (Tr. 102.) Aranda stated the officers put both Aranda and Leo in handcuffs, threw them on the fence, and told them to be quiet. (Tr. 103.) Aranda testified that as this was occurring he looked at Leo, who was telling the officers "I don't consent to searches." (Tr. 104.) Aranda states he saw the officers patting Leo down and he saw Seeger grab Leo's backpack and start going through it. (*Id.*) Aranda testified Seeger pulled a gun out of Leo's backpack and Aranda and Leo were arrested. (*Id.*)

## DISCUSSION

Leo moves to suppress evidence seized from his backpack after he was stopped by the police. He argues that the backpack was searched without a warrant and the government has failed to prove that an exception to the warrant requirement applies.

The government responds that the search of the backpack was justified as a protective pat down or protective search. Alternatively, the government argues that the search of the backpack was authorized by Leo's consent.

 *1.    Protective Pat Down or Protective Search*

As a preliminary matter, the parties do not contest that the police had the requisite reasonable suspicion to stop Leo. A brief, investigatory stop that demands only a limited intrusion into an individual's privacy is permitted under the Constitution when it is based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Police can conduct a *Terry* stop if they have reasonable suspicion, supported by articulable facts, that criminal activity is afoot. *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000). Reasonable suspicion amounts to something less than probable cause but more than a hunch. *Id.* Indeed in this case, the police had reasonable suspicion

- 6 -

to stop Leo. The officers had received a call from dispatch of a possible burglary in progress involving a gun. (Tr. 21.) The dispatch described the burglary suspects as two Hispanic males wearing black hoodies. (Tr. 21-22.) An update from dispatch stated that one of the suspects took off the black hoodie and was now wearing red. (Tr. 28.) Both officers testified Aranda and Leo exactly matched the description of the suspects from dispatch. (Tr. 29, 64.) Further, when Officer Ortiz made contact with Aranda and Leo and identified himself as law enforcement and told them to stop, they both looked back at Ortiz and continued walking. (Tr. 31.)

Thus, the sole legal question before the Court is whether Officer Seeger had lawful authority to search Leo's backpack. Stated differently, the question is whether the search of the backpack exceeded the scope of the *Terry* stop. In defending the search, the government characterizes Seeger's opening of the backpack as both a "protective pat down" and "protective search." It is true that an officer conducting a *Terry* stop who reasonably suspects that the person stopped is armed may conduct a limited pat down of the suspect's outer clothing in order to determine if the suspect is armed with a weapon. *Terry*, 392 U.S. at 24-25. *See also United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) ("To insure officer safety, a protective search for weapons is permitted during a *Terry* stop when police reasonably suspect that the subject is concealing a weapon."). But, in this case, the record does not show that a pat down of Leo's backpack occurred. Although Seeger testified that he conducted a pat down of Leo's clothing, he testified that he did not pat down the outside of Leo's backpack and instead just "went straight to the zipper" and opened the backpack. (Tr. 88-89.) Accordingly, the opening of the backpack cannot be justified as a *Terry* pat down or frisk.

As to the characterization of the search of the backpack as a protective search, the Supreme Court has not addressed protective searches of parcels in cases analogous to the case at bar. The

- 7 -

Supreme Court has addressed protective searches of compartments, containers, and parcels in the context of automobile searches. *See Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (finding that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief that the suspect is dangerous and the suspect may gain immediate control of weapons). However, the Seventh Circuit has addressed protective searches of parcels under the control of a suspect, i.e., briefcases and purses, outside of the context of automobile stops. In *Cady v. Sheahan*, 467 F.3d 1057, 1061–62 (7th Cir. 2006) the Seventh Circuit upheld an officer's seizure and search of a suspect's briefcase where the suspect was lurking in the bushes outside of the courthouse before it opened and was evasive in response to the officer's questions. Further, the suspect in *Cady* reached into the briefcase several times during his encounter with law enforcement before the officers took the briefcase away from the suspect. Citing to *Terry* and *Michigan v. Long*, the Seventh Circuit held that in the course of a *Terry* stop, an officer may conduct a protective search for weapons of an individual's person, and area within his control, if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 467 F.3d at 1061-62.

Similarly, in *United States v. Askew-Bell*, 306 Fed. Appx. 292, 2009 WL 20897, *3 (7th Cir. Jan. 5, 2009) (unpublished), the Seventh Circuit upheld an officer's seizure and search of the purse of a handcuffed suspect who was a "dead ringer" for a woman who had robbed three banks, the most recent of which was two weeks prior to the stop. The officer stated that because, during the robberies, the bank robber claimed to have a gun and threatened to shoot bank employees, he was worried that the purse might conceal a weapon that the suspect could use to injure the officer or the residents of a nursing home the suspect was visiting at the time of the stop. *Id.* In upholding the search, the court

- 8 -

stated that an "officer may search a suspect for weapons on her person or within her control during a *Terry* stop so long as 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* (quoting *Cady*, 467 F.3d at 1061-62).

Finally, in *United States v. Hopewell*, 498 Fed. Appx. 609 (7th Cir. Dec. 19, 2012), the Seventh Circuit upheld the search of a suspect's backpack based upon exigent circumstances. The arresting officer received a dispatch notification of a 911 caller reporting that a loaded gun had been pointed at him by a male bus passenger, who then placed the gun into a red backpack. *Id.* at 610. Officers located the bus, emptied it, and found a sleeping man who matched the caller's description. *Id.* The suspect was taken into custody and his backpack remained on the bus. *Id.* The officer testified that he searched the backpack out of concern for officer safety because the 911 caller reported seeing a revolver and the officer feared that a cocked revolver equipped with a light trigger could easily fire. *Id.* The Seventh Circuit found that exigent circumstances justified searching the backpack. *Id.* at 612. The Seventh Circuit stated that to "justify the search based on exigent circumstances, the government had to show that the officers reasonably believed that the search was necessary to prevent serious injury to themselves or to the public, and that there was no time to obtain a warrant." *Id.* The court found that because "the officer who searched the bag was experienced in firearms safety and knew that [the defendant] had displayed, loaded, and hidden in his backpack the revolver, he could reasonably conclude that the gun posed a safety risk and was justified in searching the backpack." *Id.*

Here, the circumstances known to the officers were not as exigent as those presented in *Hopewell*. However, both officers testified that they were concerned for officer safety, as well as for the safety of the parents, children, and teachers at the Head Start School. (Tr. 36, 68-69.)

- 9 -

Additionally, Ortiz testified that when a firearm is present, there is always the possibility that it could be discharged. (Tr. 36.) These concerns were not unreasonable. Leo exactly matched the description of the suspect in an attempted burglary. (Tr. 72.) The officers were informed that a gun, possibly a revolver, was placed in the backpack which one of the suspects was carrying. (Tr. 73.) Leo was in fact carrying a backpack. (Tr. 29-30, 63-64.) Leo continued toward the school after he was ordered to stop. (Tr. 31.) Ortiz received confirmation over the radio that he had the correct parties who were reported to be in possession of a firearm. (Tr. 37-38.) Finally, notwithstanding that Ortiz knew that the school was the work place of Leo's companion's mother, the location of the stop was a school with parents and children around. Thus, even though Leo, like the defendant in *Askew-Bell,* was handcuffed prior to the search, under the totality of the circumstances, the officers' belief that their safety and that of others was in danger was warranted. Therefore, I conclude that the search of Leo's backpack under the circumstances presented was lawful and recommend that the court deny the defendant's motion to suppress.

    *2.    Consent*

For completeness, I will also address the government's alternative argument that Leo voluntarily consented to a search. It is well established that consent is an exception to the Fourth Amendment's warrant requirement. *United States v. Glasby*, 576 F.2d 734, 737 (7th Cir. 1978). Voluntary consent "lifts" the warrant requirement. *United States v. Stribling*, 94 F.3d 321, 324 (7th Cir. 1996) (quoting *United States v. Quinones-Sandoval*, 943 F.2d 771, 774 (7th Cir. 1991)). Consent can be express or it may be implied from the circumstances. *See, e.g.*, *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000). The government bears the burden of proving by a preponderance of the evidence that consent was voluntarily given. *See United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). To

determine the voluntariness of a consent, the court must inquire whether, under the totality of the circumstances, law enforcement officers have overborne the will of the accused. *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

In this case, the testimony on this issue is conflicting. Officer Seeger testified that Leo repeatedly consented to a search. (Tr. 71.) In contrast, Leo's companion, Aranda, testified that Leo repeatedly told the officer that he does not consent to searches. (Tr. 104.) As a finder of fact, the court may accept or reject any or all of a witness' testimony. *See United States v. Berthiaume*, 233 F.3d 1000, 1004 (7th Cir. 2000). In this case, it seems counterintuitive that a suspect would continuously repeat his desire to consent. If anything, a suspect would repeat his refusal to consent to ensure that his position had been heard or to protest actions counter to his wish not to be searched. That is not dispositive, however, as people sometimes say unusual or unexpected things in police encounters. The more significant factor is that, Aranda's testimony aside, this portion of Officer Seeger's testimony cannot be reconciled with the entirety of the testimony regarding Leo's reaction to the police. By all accounts, Leo was not cooperative. Although Leo appeared to hear the command to stop, he ignored it and kept walking. (Tr. 31.) Even after Aranda stopped, Leo kept walking toward the school. (Tr. 66-67.) Leo was evasive. (Tr. 78-79.) He acted as if he wanted the police contact to be over with so that he could get into the school. (Tr. 79.) On the totality of this record, it seems incongruent that Leo would spontaneously and repeatedly consent to a search. Consequently, I conclude that this portion of the testimony is too internally inconsistent with the entirety of record to be reliable. Accordingly, I recommend that the court finds that the government has not met its burden on the issue of consent.

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendant's motion to suppress (Docket # 12) be **DENIED**.

**IT IS FURTHER ORDERED** that the defendant's motion to strike the government's reply brief (Docket # 29) is **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), and Federal Rule of Criminal Procedure 59(b)(2) (as amended effective December 1, 2009), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal.

Dated at Milwaukee, Wisconsin this 30th day of October, 2013.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge